Good morning, the Honorable Panel. My name is Robert Helfing. I represent the appellants, FUNKY FILMS and Gwen O'Donnell. This case involves the issue of whether two literary works that are substantially similar, more particularly whether there is substantial similarity between the selection and arrangement of unprotectable elements of the works. The last time this issue came before this Court, in a published decision, the Court described its experience as delving into turbid waters. It is an elusive concept and difficult to talk about in oral argument, but I think that the defendants have provided us with a good way to determine what is protectable, what substantial similarity is sufficient to meet the standard. And that's found in their footnote 3 of their brief, where they summarize the cases where this Court has found that there was insufficient substantial similarity. And if I may just read a little bit, I'll just read the first three cases that they cite here. And they're summarizing the elements that were similar between the works in those cases. In a case called Kalf v. Walt Disney, they describe it as children with concerned parents get shrunk by scientific invention, undergo life struggle, fight insurmountable dangers, including lawnmowers, sprinklers, and sleeping outside overnight. Next case, Berkik v. Crichton, young professional courageously investigates and exposes a criminal organization that murders healthy young people and removes and sells their vital organs to wealthy people. In third case, Litchfield v. Spielberg, alien becomes stranded on Earth, befriends Earthling children and a scientist, demonstrates extraterrestrial powers such as levitation and telepathy, is pursued by authoritarian characters, and eventually discovers a means of returning home. If you... How do you establish substantial similarity? You establish it... Is that a visceral reaction by judges or jurors or lawyers or what? It's a two-part test, Your Honor. There's an extrinsic test and an intrinsic test. The intrinsic test... I know the test, but the test are just words. That's true. That's what I'm trying to do by presenting to you what this Court has found is insufficient and to compare it with the types of similarities that you can find in this case, which goes way beyond what the courts in those cases found to be similar there. Well, maybe if you talk about it here because, you know, obviously one of the things in your case that, if I want to play the devil's advocate here, that six feet under is not a murder mystery. And in the funk parlor, there are many homicides, Jennifer, Beauchamp, Tom, Polly, Police Chief Angeli and Sophie. There's also an attempt on what, Father Fred, I believe, also. The plot revolves around homicides. And, in fact, you promoted your screenplay as Fargo in a funeral home. Isn't this distinction something that could be argued to be fatal to your claim of substantial similarity? Well, I think that the defendants do argue that. And it's true that six feet under is not a murder mystery. But then the fact that there is a difference, even a significant difference, between the works doesn't mean that there's no substantial similarity. The question is Okay. What was that word you just used? Just because there's a Significant difference. Significant difference. It's not substantially similar. There is I mean, there's a little bit there that I'm I don't mean to deny that this murder is part of a plot, is an important part of a plot of funk parlor, and it's not found in Six Feet Under. There's no denying that. That's a difference between the works. The question isn't whether the works are different and what the differences are. The question is what the similarities are, and is that similarity protectable? But I think what Judge Ferguson is saying, it's hard to pull out, you know, I mean, we know what the test is, but it's hard to say when you're saying there's a significance difference, but they can still be substantially similar, those, if there is a significant difference, can they be substantially similar? Well, I guess we're getting into the definition of the word significant. Again, there's no doubt that that was a part of a plot. That was something that drove the plot, at least from about, I can't remember what it was, after about 60% of funk parlor had elapsed, that became a very important part of the script. But the question is, do you allow the defendants essentially to steal the rest of the Well, obviously they're never going to be carbon copies, exactly. So everyone's always going to be able to point out some differences. That's right. If they're carbon copies, we wouldn't be here, certainly. The question is, you need to be able to isolate what we're claiming is protectable, what is similar between the two works, and if you regard those similarities as being protectable, then you have substantial similarity. Here they've How do judges determine the common property of artistic mankind, which is not protectable? How is that determined? I think you know what one's If you have an automobile accident, a routine automobile accident, you're going to have an expert testify that the person was driving 75 miles an hour based upon skid marks. How do judges and lay jurors determine these very fine judicial concepts that have a lot of words but very little everyday meaning? General, common property of artistic mankind. I don't think that a family-run funeral home with two sons, where the family is, where the funeral home is divided between them, where one of the sons is gay, where another of the sons is a normal person, not like a mortician, where the girlfriend has a sexual obsession, where there's a takeover attempt by a larger funeral home, where this takeover attempt is launched at the father's funeral, where the leader of the takeover attempt is a domineering woman who makes a lowball offer to the elder son, causes him, who had previously not wanted to be involved in the funeral business at all, now causes him to decide that he's going to help his younger brother, who had stayed behind to help his father run this business all these years, he's now going to help him try and save that business. And all the other things that we cited in our briefs, that is not the common property of mankind or culture. That's not something that everyone should be free to use. That's not something that occurs to people accidentally. And it's not something that people need to be free to be able to use as a premise. A family-run funeral home, absolutely. We have no monopoly on that. The fact that some father decides to split his business between his two sons, of course we don't have any monopoly on that. But when you put together all the things that we do that form the framework, the selection and arrangement of unprotectable elements, when you put all those things together, we're not taking anything out. What percentage of protectable elements are necessary? Is there a percentage? You know, Your Honor, I do a lot of work. More than 50 percent? Less than 50 percent? I've done a lot of work in the clothing business, and a lot of people in that business say, well, it's 33 percent. There's no such number. It's something that I think the Court It's all judicial guesswork? Is that what you're saying? I wouldn't call it guesswork any more than any other case. You have the Metcalf case as authority. That shows you what this Court considers to be protectable substantial similarity. This case goes at least as far as the Metcalf case in showing a selection and arrangement of protectable elements. I would like to ask you a few questions about the standard of substantial similarity, particularly as it applies here. There were a couple. I just sort of want to reference a couple of things as backdrop, and then have you give me your take on this. The district court cites to Burkick in its substantial similarity analysis. They're like here the defendant stipulated to access to the work in question. Am I correct on that? The defendant here did not stipulate to access. But for purposes of summary judgment, do we have to assume that if you No. In fact, I think the defendants raised lack of access as one of the bases of their motion. Well, do you think that the, but if we give all inferences in favor to the plaintiff, what evidence does the plaintiff put on on that? What evidence do we have of access? Oh, we had quite a lot of it. I can go through it. It is discussed in the Okay, but if it is a summary judgment, then if all inferences have to go to the plaintiff, then if you get over the access. Did the district court misapply the standard of proof as applied in Burkick here? I think, yes. I think the court was not aware of that, of this inverse ratio rule, meaning that the more access there is, the less substantial similarity you need. Doesn't, oh, right. If you have that, the district court, I know at another place in the record, said that they were, that it was applying the lower standard of similarity standard when you were making your request for additional discovery. Yes, it did say that. Okay. But you're saying that it did not apply the lower standard. It did apply, but it didn't apply it properly. Okay. Tell me where, tell me what was wrong. Because that's, there's not a set standard for substantial similarity. The lower standard depends on how much access, at least in part, depends on how much access is shown. This court has said repeatedly, the more access, the less substantial similarity. The court didn't treat it that way. The court just said, well, we're not going to apply this higher standard. We're just going to apply the lower standard. There is no fixed lower standard. There is a scale, a flexible scale. Well, if the court applied the lower standard, can we take from that that the court took all inferences in your favor, that there was access? Because do you get to the lower standard if you don't have access? No, you don't. So I think you're correct, Your Honor. You can assume that the lower standard, and the court said that, that the lower standard was being applied. It just didn't apply it. It didn't take the further step in saying, well, this is where we put the standard because of the amount of access. Well, so I think the main trouble that the court is having is determining where to fix this substantial similarity. And there is no fixed standard. But, again, there's no fixed standard for negligence. There's no fixed standard for really any of the concepts that the court has to deal with. In this case, when you look at the precedent, you look at the Metcalf case and see how this case compares to that. If you look at these cases that are cited in the footnote that I just took the time to read, and I apologize for reading to the court, but it's important because this shows what's insufficient. Metcalf shows what is sufficient. Well, I agree with you on that. When you have these type of standards, the cases are what help you for the high and the low watermarks. And then, I mean, if you can fall precisely within a case that gives the answer, then you're fine. But, obviously, I think we're arguing here between the high and the low watermarks. And so you've got to say they're more similar to the cases where it is, you know, it is substantial similarity and they're going to say that it's more like the ones where there's not. Well, and the facts, I think, speak for themselves, although I've been trying to speak for them, I guess, for the last 15 minutes. So if the court doesn't have any further questions, maybe I'll reserve the last six and a half minutes. All right. Thank you for your argument. Thank you. Good morning. May it please the Court. My name is Jeff Conciatori. I'm counsel for the Appalese Time Warner and HBO. We believe that the lower court... My problem with your side is this is a summary judgment case. Now, what right does a judge have in granting summary judgment when all of the issues are factual? Well, Your Honor, on a motion for summary judgment in a copyright case... No, no. It's for testimony. They're just nothing. And the judge just looks at both works and decides that, in his mind or her mind, that summary judgment should issue. Now, does that make sense in the judicial system? Your Honor, I can't speak to whether it makes sense. However, it has been the law in this circuit... That's what we're here for, making sense. ...for some time. I think it does. Let me say I think it does make sense, Your Honor, but it certainly has been the law for many, many years in this circuit and elsewhere throughout the United States that a trial judge is entitled to make a determination as a matter of law if, after looking at the works and analyzing them in a certain way, and in the Ninth Circuit there's a set procedure that trial courts are supposed to use. It's called the extrinsic-intrinsic test. Judge Carney followed it. He applied it faithfully. And he had the benefit, Your Honor, in this case, of expert reports on both sides of the issue from fairly competent, well-respected individuals. He chose ultimately, in his opinion, not to rely on those. However, those are in the record and there's extensive information for, there was for Judge Carney and there is for Your Honors, concerning the various extrinsic factors. Well, let's, what about the standard of review here? And I think that we've talked about this from when, what is the lower standard of proof for substantial similarity when access is high? And also, too, as far as I can tell, the district court never articulates the standard of proof. How do we know that it applied the right standard? Well, in this case, Your Honor, there wasn't the level of high access that this court, the Ninth Circuit, has found necessary in order to invoke the inverse, the so-called inverse ratio rule. The inverse ratio rule. Counsel? Yes. Can you, access for the purposes of this case is conceded. Is that not correct? No, Your Honor. That's not correct. As a matter of fact, the defendants made an independent motion for lack of access for summary judgment. The access here, Your Honor, was that the plaintiff alleged that she gave her screenplay to a chiropractor. I understand that. But for the purposes of the summary judgment, did not the district court judge assume access? The district court, Your Honor, in a footnote, indicated that he was analyzing the issue as though there was independent evidence of access. That is a distinction, Your Honor. I'm sorry. That's where we are, Counsel. And in your brief, you continually put in some side evidence on access, and I don't think that was right. Your Honor, the reason we did that is because this court has held that in order for the inverse ratio rule to apply, there has to be clear and convincing evidence of a high level of access. In that case, yes, Your Honor? Counsel, the judge said for the purposes of the summary judgment, that he was going to concede access. Well, I don't see how you could get along arguing that. Well, the way you're arguing that, I think would dissent back if that's your position. Well, Your Honor, I think there are two, there are different types of access. In the Metcalf case, the access was found by the Ninth Circuit on the first appeal to be direct to two people involved in the creative development of the script, namely an actor and Stephen Bochco, the creator and director of the show. In this case, there is alleged access only, and for purposes of his evaluation, he assumed that there was independent evidence of access. But, Your Honor, the Ninth Circuit in Rice has said, has distinguished Metcalf. Rice is a 2003 decision involving two works where there were, about revealing the secrets of magic, Your Honor. And in that case, the Court distinguished Metcalf and said that not only are we not presented with the same pattern of generic similarities as Metcalf, even more important, Metcalf was based on a form of inverse ratio analysis. And then it goes on to say, here there is no such concession of access as most of Rice's claims are based purely on speculation and inference. We respectfully submit, Your Honor, that that applies to this situation. We argued below that the plaintiff's access theory was based purely on speculation and inference, not just one inference, a series of inferences. In order to move past that and get to the substantial similarity as a matter of law, Judge Carney assumed away the issue in his footnote. But by doing so, yes? Counsel, if we assume access, can you win this case? Yes, Your Honor. Yes. I'm sorry? Why don't you argue that? Well, Your Honor, assuming access as a matter of law, the Court is still intended to look at whether there's substantial similarity between the two works. There is an entitlement of a defendant, even assuming that they have access to a copyrighted work, to use uncopyrighted elements of it. The Burkitt case, Your Honor, taught us that only protectable, articulable, concrete expression is protected and can't be used. The Rice case teaches us that we have to factor out when we do the analysis things unprotectable, items or features, such as ideas, concepts, expression, where there's a limited availability of words, the so-called merger doctrine. Stock elements. Cens a faire, which are scenes that have to be because of where the setup occurs. Or elements borrowed from other sources or public domain material. These are all so-called limiting doctrines. Even if a defendant or a creator or writer has access to copyrighted work, they can still utilize unprotected elements within it. Counsel, let's get down to the specifics of this case. I think the judges know the law and know the standards. Just tell us what we've got going here. Well, we don't believe, Your Honor, that these, if you apply the basic factors of the extrinsic test, plot, theme, dialogue, et cetera, you can come to any other conclusion but that there was an insufficient amount of concrete, protectable expression taken. The plaintiffs start with the theory that the family-run funeral home is somehow unique and protectable. We pointed out to the district court that there are many, many evidence, there's much evidence in the record, in the historical record, of the use of family-run funeral homes in literary projects, including television shows, there were two of them in 1990 that came out. One, the Finelli Brothers, and the other one was called Good Grief. They came out simultaneously. And this is perhaps, and the next year there was a movie called My Girl, set in a funeral home. This is the best evidence that the funeral home is not a unique, protectable setting. And as a matter of fact, in this very situation, there was a writer who claimed in New York, in a separate case, to have created the concept of a family-run funeral home. His name was Cakley. He also sued HBO and Allen Ball. He lost. Judge Brizzo found, in that case, that a family-run funeral home was a stock setting. In that case, Mr. Cakley had written the work in the 90s, before the plaintiff, in our case, had. And he had a mother running a funeral home with three sons. That was even closer than this particular alleged parallel. And in that case, the district court in New York found applying the extrinsic factor, effectively the functional equivalent of the extrinsic factor test, that there were insufficient similarities. Your Honor. Anticipating that he's going to be able to, you know, he has rebuttal time. And he's going to, what are you saying, you just, I think you pointed to the family-owned funeral home. What's not protectable and what, you know, what are the dissimilarities in your best argument? Well, Your Honor, as the lower court found, the defendant's work, Six Feet Under, is an introspective drama, moving through a series of serious relationships between individuals. There are two men, a woman and a mother. There are many other characters in the work. The nature of the work is a drama, primarily, Your Honor. There is no similar dialogue in the works. The themes of the two works are very different. The plaintiff's work is a, what we would call a farcical murder mystery. I think that's what the court called it, or did you call it that first and then the court adopted that? I think everyone calls that, calls it that, Your Honor. Even the plaintiffs themselves called it a farce, I believe, when they were promoting it. And that, more than anything else, sets the stage for what we believe should be the conclusion, that these are not substantially similar. We can talk about it a lot and we can write about it, but as Judge Ferguson asked at the outset of the argument, how do you determine it? I think you determine it by reading the script and watching the defendant's work and looking at whether there are similarities as to the plot, as to the characters, and so forth. If you were able to simply say, as the plaintiffs would have this court hold today, that a series of unprotectable elements can be creative expression in a literary work, and I think there is some doubt about that premise, because that premise began with the Feist decision, where the Supreme Court was looking at primarily factual works,  However, if you were to conclude that you could apply that type of analysis to a literary work, we respectfully submit that the overlap must be substantial. It must actually approach near virtual identicality for that to work. Do you have a case that says that? Substantial must approach near identicality? Virtual identicality? I do believe that there are cases that do say that, Your Honor. That standard? I think the Feist case actually does talk about that. And in fact, it says that there isn't — there was, in fact, in that particular case with regard to phone book directories. And the reason for that, Your Honor, is with — other than that, a plaintiff could take isolated similarities, what have been known in the industry for a long time as fragmented literal similarities, and argue that those somehow constitute substantial similarity. If you were to do that, as the experts did this and have done this analysis and presented it to the lower court, you would find that there were similarities between The Godfather and It's a Wonderful Life, between Gone with the Wind and Casablanca, between Star Wars and The Wizard of Oz, between the funk parlor and The Godfather. If you were to look at the themes, for example, that they put forward at the district court level to the funk parlor and the common themes that the funk parlor and 16 under purportedly had, you could find all of those themes in The Godfather. Counsel, let's take this scenario. Let's suppose that your client did have access. He looks at this play and he says, well, I like the idea of a play in a funeral home. I like the theme of two sons coming back, the prodigal son and the conflict. But you know, what I want to do is to do a play or a series which focuses on the interrelationship of the people and with the mother. It's no murder mystery that I'm going to do. I like the idea of this theme, but I don't want to put it together in that way and I'm going to develop the characters in a much different way. Is that a problem for your client or is that okay? Your Honor, I believe that the law, the precedent would say that that is acceptable, that you can do that provided what you are looking at and starting with are unprotected plot premises, basic plot premises. For example, in the Denker v. Urey case in 92, Judge Mukasey in New York was looking at a challenge to Driving Miss Daisy and in that particular case the plaintiff had written a work in which an elderly person suffered an accident at the outset of the literary work and causing this person a great deal of pain. In a similar way, Driving Miss Daisy starts and the court held in that case that the fact that an accident befalls the protagonist of two works is not enough of a similarity to make it substantial similarity. So I do think, Your Honor, that you could, if that were not the law, then it would be virtually impossible to write anything that didn't somehow infringe on other people's works. But here we have a little more. The father dies. We've got the prodigal son. We've got the gay son. Yes, Your Honor. I can address all those. The prodigal son has been around in industry forever, in literature forever. Back to the Bible, as the judge lower court found, various literary works have evidence of the prodigal son in it. The fact that there are two sons is not that unusual. There are many shows which have two sons. The fact that they inherit the property is not that unusual. Right. Let me ask you this. Let me ask you this. At some point, though, would you concede if you get enough of these unprotected interests and they all converge in one plot, would that be substantial similarity? I do think that looking at the extrinsic factor test, if you were to look at the plot and the sequence of events, which are two of the eight factors that the courts have looked at for years in analyzing these issues, if you found a substantial overlap in the plot and the sequence of events, the interrelation between the characters, how they act and what they do in the story, then the answer would be yes, there could be substantial similarity. But you would have to be making that determination based on a careful review of the extent of the two works. So essentially 200 unprotected things, if they all came together in one, could at some point be substantial similarity if the 200 unprotected are in 200 in the other? Well, I think what you'd have to – what I think the law ought to be here, and it is not clear. I don't believe the law is clear on applying this particular principle to a work of literary expression. However, if you were to assume that it did, I think you would have to find by virtue of the multiplicity of common elements that the plots were substantially similar and the sequence of events were substantially similar. And here the plaintiff has not done that. At most, the plaintiff has given a list of 25 similarities. Lists of this sort have been routinely rejected by the courts and by the Ninth Circuit in – There aren't – there isn't enough here for the court to come to that conclusion, even if this court were to apply the feist analysis. And if the court were to apply a feist analysis to this literary expression, we believe, as we said before, that there would have to be virtual identity between the two works. And here there can't be any – here we respectfully submit that that's not the case. Unless the Court has further questions for me, which I'd be happy to respond to, I'll close by saying that we believe the lower court should be affirmed. Yes, Your Honor. I have one further question. You say virtual identity. Is that applied when you're applying the lower standard when there's access? Do you hear my question? Yes, I heard it. I'm thinking about it. I'm thinking about it. I would say yes, Your Honor, because of the nature of feist. However, if the court – if the court were to find there to be, under a lower standard, there to be sufficient similarities among these elements such that a jury could conclude that there was substantial similarity, then the case ought to be sent to a jury. However, absent that, it ought not to be, and the court is entitled to and authorized to grant summary determination in favor of the defendant. Thank you for your argument, counsel. Thank you. This has no bearing on the case, but why was this tried in Orange County? I believe our – I didn't handle the underlying case, but I believe that the plaintiff lived there. Let me just talk about this virtual identity standard. It doesn't apply to this case. The only time the virtual identity standard has ever been applied has been in situations where there has been – the type of work involved allowed for little artistic variations, such as a phone book in feist. What they say is if you're going to get copyright protection for a phone book, the other guy has to copy it virtually identically. There's only so many ways you can do a phone book. Another situation, this court applied that standard in the Apple computer case, which is cited in our briefs, which involved a graphical user interface. Those type of technical, utilitarian works that allow for very little variation, there has to be virtual identity. But in the Apple computer case, this court said that that doesn't apply to artistic works that allow for virtually infinite variation. And I would submit that a literary screenplay allows for such variation. And you'll note that the virtual identity standard was not applied in the Metcalf case. I do want to go back and address the issue of protectability. We are not alleging that a family-run funeral home is protectable. It's rare. The defendants were only able to point to four works that ever were prem in the history of television and movies that were based on a family-run funeral home. But even so, no setting is protectable. No theme is protectable. None of the things we're claiming as similarities are protectable, except one. The only thing that we're claiming is protectable here is the selection and arrangement of all these things. That's the protectable portion that is similar and, in fact, identical to what they have taken. They have taken that same selection and arrangement of elements, used it in the same combination. They're not random. When you look at the council referred to a list of similarities, we aren't claiming that there's similarity here because one character has brown hair and another character has brown hair or that it all takes place in 1988 or whatever. We're claiming things that are central to the plot, central to the artistic intent behind these works. Those things were taken. The sequence of events, the way the takeover attempt unfolded, the way that the character relationships are set up with a gay younger son, an older son who returns from out of town, who's trying to escape from the funeral business, those things aren't random similarities. They're not lists of things that are similar. They show a core of artistic intent. The heart of this work is what the selection and arrangement is. That's what we're claiming is protectable, not any of the individual elements. Theme. I think this is very important. We pointed out and council raised the idea of the theme. We didn't really say what it was. The theme here as we lost Judge Fletcher. Oh, we did. Okay, let's stop the time. Did you see her just go right now? I was reading my notes here. Yes, just now. Okay. Okay. Oh, she's back.  Yes, I don't have a picture, but I've got the voice, which is okay. Okay, I can see your picture. Can you see your picture? Okay, we've got you back. Appellant's counsel alerted us right when you went down, so we're putting him back. I think you had a few more seconds, but go ahead, continue. Yeah, I just wanted to touch on a couple of these. You were on theme, I think. Yes, extrinsic test factors. We pointed out that the theme here, or one of the pervasive themes in both of these works, is the character's inability to escape their family, their nature, their destiny. This theme was announced by sort of a Greek chorus in the Six Feet Under, who's the dead father who comes back and basically tells everyone what everything's about in that case. He came back in a fantasy sequence in the first episode and basically said, this is the theme of this show. He said, you can't get away, Nate, the older son, you can't get away from your family, you can't get away from the life that you were born into. And this theme pops up. The same thing happens to the elder son in the funk parlor. This theme happens in at least three other significant ways, which we point to in the briefs. The characters struggle against their own nature. The girlfriend of the elder son tries to struggle against her particular mental illness and she can't do it. The younger son struggles against his sexual identity and he can't do it. And they all try to get away from their father. The father is the controlling force in this thing. They all try to get away from his influence and they can't do it. That's the theme. And that theme is there in both works. And there's no other theme that is anywhere near as important as those in either of these works. And then I want to talk about tone because this was made a large point of when they refer to the funk parlor as being a farce. It most certainly had farcical elements, so does Six Feet Under. Say tone, are you talking mood? Yes. Are you interchanging those? Yes, I am interchanging them. Okay. The mood of it, but I guess in a literary context, I think of it more as being tone. It is a farce. There are comic elements to it. The same thing that I'm referring to the funk parlor. The same thing applies to Six Feet Under. To dismiss the funk parlor as a farce is really to ignore the most important parts of it. Because while it did have farcical elements, what the funk parlor depends on for its artistic effect is realism. You wouldn't care about the younger son's sexual identity. You wouldn't care about Sophie's sexual obsession or mental illness. You wouldn't care about the older son's struggle or the struggle of the family run business if it was simply a farce. A farce is simply something that depends on humor. Those things, to achieve their artistic effect, those things depend on realism. Both works are real, but they both have elements of farce. They both have elements of comedy to them. All right. Well, I'm going to need to have you wrap up because your time has expired. I want to thank both of you for your argument in this case. This matter will now stand submitted. Thank you very much. Thank you.
judges: B. Fletcher, Ferguson, Callahan